FILED
2013 Mar-07  PM 01:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **LORI JANE SHANEYFELT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-11-S-4366-NE** |
| | ) | |
| **REC I/BLUE SPRINGS** | ) | |
| **LIMITED PARTNERSHIP; JP** | ) | |
| **PROPERTIES, INC.; SUSAN** | ) | |
| **BELL; and DOLGENCORP,** | ) | |
| **LLP,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This action arises from the wrongful death of Danny Joe Shaneyfelt, an independent roofing subcontractor who fell through a "soft spot" in the roof of a Dollar General Market.[1]  Plaintiff, Lori Jane Shaneyfelt, filed suit as the widow and personal representative of the estate of Mr. Shaneyfelt, and asserts state-law claims for negligence and wantonness against defendants, REC I/Blue Springs Limited Partnership, JP Properties, Inc., Susan Bell, and Dolgencorp, LLP.[2]

Plaintiff commenced this action in the Northern District of Alabama pursuant to 28 U.S.C. § 1332(a)(1), based upon the parties' complete diversity of citizenship

---

[1] Doc. no. 22 (Amended Complaint) ¶¶ 1-3.

[2] *Id.* ¶¶ 13-22.

and the requisite amount in controversy.  Accordingly, "state substantive law and federal procedural law" apply.  *Hanna v. Plumer*, 380 U.S. 460, 465 (1965).

The action is before the court on three related motions.  First, defendants REC I/Blue Springs Limited Partnership, JP Properties, Inc., and Susan Bell (collectively, the "Blue Springs defendants") and defendant Dolgencorp, LLP have each moved for summary judgment.[3]  Further, the Blue Springs defendants have moved to exclude a portion of the evidence offered by plaintiff's experts.[4]  Finally, plaintiff has moved to strike an affirmative defense asserted by the Blue Springs defendants.[5]

Upon consideration of the parties' briefs and evidentiary submissions, the motions to exclude the expert testimony and to strike the affirmative defense will be granted, and the motions for summary judgment will be denied.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he

---

[3] *See* doc. no. 43 (Motion for Summary Judgment by REC I/Blue Springs Limited Partnership, JP Properties, Inc., and Susan Bell); doc. no. 45 (Motion for Summary Judgment by Dolgencorp, LLP).

[4] *See* doc. no. 46 (Motion to Exclude).

[5] *See* doc. no. 58 (Motion to Strike).

plain language of Rule 56(c) mandates the entry of summary judgment, after adequate

time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986) (alteration supplied).

> In making this determination, the court must review all evidence and
> make all reasonable inferences in favor of the party opposing summary
> judgment.
>
> [However,] [t]he mere existence of *some* factual dispute will not
> defeat summary judgment unless that factual dispute is *material* to an
> issue affecting the outcome of the case.   The relevant rules of
> substantive law dictate the materiality of a disputed fact.   A genuine
> issue of material fact does not exist unless there is sufficient evidence
> favoring the nonmoving party for a reasonable [factfinder] to return a
> verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal

citations omitted) (alterations and emphasis suppled).

## II.  SUMMARY OF FACTS

**A.    Defendants' Relationship**

Danny Joe Shaneyfelt fell to his death through the roof of the Dollar General

Market ("Dollar General") at the Blue Spring Village Shopping Center in Huntsville,

Alabama.[6]   The shopping center was owned by defendant REC I/Blue Springs

---

[6] *Id.* ¶ 2.

Limited Partnership ("REC I"), an entity in which defendant JP Properties, Inc. ("JPP") held a 20% interest as a limited partner.[7]  The shopping center was managed by defendant JPP.[8]

In turn, JPP had two employees:  *i.e.*, Andrea Plotkin, JPP's owner and president; and defendant Susan Bell, its director of operations, who was responsible for the shopping center's bills, leases, and day-to-day maintenance and upkeep.[9]  Ms. Bell, who resided in Alpharetta, Georgia, performed her job duties from her home office, and visited the property on a quarterly basis.[10]  Ms. Bell had degrees in journalism and business from the University of Georgia, and no expertise as a commercial roofer.[11]

At the time of the events leading up to Mr. Shaneyfelt's death, one of the commercial spaces at the Blue Spring Village Shopping Center was leased from defendant REC I by defendant Dolgencorp, Inc. ("Dolgencorp") in order to run a Dollar General retail store.[12]  Pursuant to the terms of the lease, the maintenance of the roof was the responsibility of the premises owner (*i.e.*, defendant REC I), and not

---

[7] Doc. no. 43-1 (Deposition of Andrea Plotkin), at 14-15.

[8] *Id.* at 16.

[9] *Id.* at 9-10; doc. no. 43-2 (Deposition of Susan Bell), at 12-15.

[10] Doc. no. 43-2 (Deposition of Susan Bell), at 8-9.

[11] *Id.* at 12, 27-28.

[12] *Id.* at 18-21.

the lessee (*i.e.*, defendant Dolgencorp).[13]   Even so, the lease gave defendant Dolgencorp the right to make repairs to the roof if the property owner failed to complete repairs within thirty days, and allowed Dolgencorp to make any repairs when "property loss or injury to persons [was] threatened" — a right that Dolgencorp threatened to assert on four occasions.[14]   The lease also required Dolgencorp to have maintenance performed on its rooftop  heating, ventilation, and air conditioning ("HVAC") units at least four times a year.[15]

To report leaks, Dollar General employees called the telephone number for a maintenance hotline that, in turn, contacted the property management company (*i.e.*, defendant JPP).[16]   In addition to calling the hotline, the employees often called the property manager (*i.e.*, defendant Susan Bell).[17]   When employees notified JPP of leaks, JPP selected a professional roofer to inspect and repair the roof.[18]   Dolgencorp

---

[13] Doc. no. 43-1 (Deposition of Susan Bell), at 19-20, 93.

[14] Doc. no. 60-1 (Dolgencorp Lease), JPP 70, ¶ 7 (alteration supplied); doc. no. 60-2 (Dolgencorp Default Letters).

[15] Doc. no. 60-1 (Dolgencorp Lease), JPP 84, ¶ 37.

[16] Doc. no. 45-5 (Deposition of Susan Bell), Exhibit 8 (Year-to-Date Ledger); doc. no. 45-6 (Deposition of James Hill), at 14-15.

[17] Doc. no. 49-2 (Deposition of Bruce Akers), at 25; doc. no. 50-1 (Deposition of Teresa Sanders), at 56-57.

[18] Doc. no. 45-5 (Deposition of Susan Bell), at 26-27, 62; doc. no. 55-1 (Deposition of Shawn Terry), at 30-31; doc. no. 56-2 (Deposition of Sammie Earskine), at 12, 18-19.

did not select the roofer, and did not pay for its work.[19]

## B.    The Roof's Nature

In order to understand the events that contributed to Mr. Shaneyfelt's fall, one must understand the nature of the roof through which he fell.  The Dollar General stores was covered by a 35,000 square foot roof installed in 1980, and designed to serve as a structural component of the building.[20]  The roof was four inches think and comprised of four layers: *i.e.*, 2 inches of insulation; ½ inch of wood fiberboard; ½ inch of asphalt; and 1 inch of pea gravel.  The entre structure was supported by a 26 gauge steel deck.[21]  It is the steel deck that is at issue in this litigation.

Given that the law requires a commercial roof to be capable of supporting a variety of upward, downward, and lateral loads, including the weight of a person, it is uncommon for a commercial roof to collapse under the weight of one person.[22]  Indeed, before defendants hired Mr. Shaneyfelt, the Dollar General roof had regularly been traversed by store employees and HVAC and roof repairmen with heavy

---

[19] Doc. no. 45-5 (Deposition of Susan Bell), at 26-27; doc. no. 56-2 (Deposition of Sammie Earskine), at 20.

[20] Doc. no. 57-1 (2009 Roof Replacement Proposals), at 5, 7; doc. no. 51-1 (Neslon Architectural Commercial Roof Collapse Evaluation), at JPP 184.

[21] Doc. no. 57-1 (2009 Roof Replacement Proposals), at 5, 7.

[22] Doc. no. 49-1 (Contech Services Roof Condition Investigation), at JPP 265; doc. no. 52-1 (Deposition of Ben Hixson), at 11-13; doc. no. 53-1 (Deposition of Matt Sams), at 54-55, 153-54.

6

equipment.[23]

Because the materials that *comprise* a roof are separate from the deck that *supports* the roof, the fact that a roof needs replacement does not prove that the deck needs replacement.[24]   A roof can leak numerous times before the deck suffers damage.[25]   Ben Hixson, an expert witness, and Sammie Earskine, a longtime commercial roofer who worked on the Dollar General roof, estimated that its deck had been deteriorating for eight to ten years before Mr. Shaneyfelt's fall.[26]

## C.   The Roof's History

Tip Top Roofing & Sheet Metal, Inc. ("Tip Top Roofing") performed all roofing for the Blue Spring Village Shopping Center between the opening of the Dollar General store in 2004, and the bankruptcy of Tip Top Roofing in December of 2010.[27]   The parties have submitted the testimony of four individuals who worked on the Dollar General roof as former Tip Top Roofing employees or contractors: *i.e.*, Heath Jones, Shawn Terry, Sammie Earskine, and Elke Coleman.[28]

---

[23] Doc. no. 49-2 (Deposition of Bruce Akers), at 33, 55-56; doc. no. 50-1 (Deposition of Teresa Sanders), at 57.

[24] Doc. no. 52-1 (Deposition of Ben Hixson), at 159-60.

[25] *Id.* at 197.

[26] *Id.* at 120-21; doc. 56-2 (Deposition of Sammie Earskine), at 60-61.

[27] Doc. no. 43-2 (Deposition of Susan Bell), at 65; doc. no. 43-9 (Deposition of Sammie Earskine), at 12-13, 88-89.

[28] *See* doc. no. 54-2 (Deposition of Heath Jones); doc. no. 55-1 (Deposition of Shawn Terry); doc. no. 56-2 (Deposition of Sammie Earskine); doc. no. 64-1 (Deposition of Elke Coleman).

7

Although the roof of the Dollar General "started leaking real bad" when the store first opened in 2004, and continued to have numerous leaks until Mr. Shaneyfelt's fall on October 12, 2011, only some of the leaks were reported and repaired.[29]  Within the year of the Dollar General's opening in 2004, the roof had deteriorated to the extent that water was pouring through the deck onto the floor, which essentially required the installation of a new roof in a 50 square foot area of the store.[30]

According to Tip Top Roofing Contractor Heath Jones, the roof of the Dollar General leaked so often throughout the rainy season that he dealt with its property manager, defendant Susan Bell, on a daily basis.[31]  Mr. Jones also testified that during the two and one half years he worked for Tip Top Roofing, the company was called out to the Dollar General store approximately fifty times.[32]   In 2008, Mr. Jones informed Ms. Bell at least once that the deck was rusted, and "three or four times" that the roof should be replaced.[33]

---

[29] Doc. no. 49-2 (Deposition of Bruce Akers), at 26; doc. no. 50-1 (Deposition of Teresa Sanders), at 33-36; doc. no. 55-1 (Deposition of Shawn Terry), at 30-3; doc. no. 56-1 (Deposition of Susan Bell), at 56-61; doc. no. 56-2 (Deposition of Sammie Earskine), at 12, 18-20; doc. no. 59-1 (DGM 2009-2011 Roof Work History).

[30] Doc. no. 56-1 (Deposition of Susan Bell), at 37; doc. no. 56-2 (Deposition of Sammie Earskine), at  26, 58-61; doc. no. 59-4 (2004 Roof and Deck Replacement).

[31] Doc. no. 54-2 (Deposition of Heath Jones), at 39.

[32] *Id.* at 106-09.

[33] *Id.* at 112-18.

8

In March of 2009, Tip Top Roofing sent defendants JPP and Susan Bell an electronic mail message ("e-mail") with a quote for replacing the Dollar General roof, making a point of excluding the cost of replacing the deck.[34]  Ms. Bell forwarded the quote to Andrea Plotkin, the owner and president of JPP, expressing dismay at the price of the repairs, and noting that the store had "2,000 to 3,000 [square feet] of rusted metal decking," that Tip Top Roofing would not itself do the work of replacing the decking, and that it was awaiting a quote for that work from two of its vendors.[35]

The following month, defendant Susan Bell and Andrea Plotkin arranged for Centimark, a national roofing contractor, to inspect all the roofs at the Blue Springs Village Shopping Center.[36]  In its "Roof Assessment and Proposed Solution," a twenty-page report accompanied by diagrams and photographs, Centimark concluded that:

> The roof [of the Dollar General] is in poor condition.  A new roof installation is now recommended.  This roofing work is suggested now to eliminate the risk of expensive tear off and potential deck replacement associated with continued repairs or re-roofing delays.
>
> . . . .
>
> **Deck:**  [As of the date of the assessment,] the structural deck of the roof appears to be in good condition from the underside.  There were

---

[34] Doc. no. 57-1 (2009 Roof Replacement Proposals), at 2.

[35] *Id.* (alteration supplied).

[36] *Id.* at 6.

no visible deficiencies noted that caused concern.

- (All) Ceiling Tiles - Deteriorated - Not visually appealing and safety issues may arise.  (see photo)

- (All) Ceiling Tiles - Stained - Not visually appealing and safety issues may arise.  (see photo)

- (All) Water Collection Containers - Not visually appealing and safety issues may arise.  (see photo)[37]

By some point in 2009, the rust on the deck was visible from the floor of the store through the holes in the ceiling tiles, which allowed Tip Top Roofing Contractor Sammie Earskine to show the rust to defendant Susan Bell and the managers of the Dollar General, including the rust in the area through which Mr. Shaneyfelt later fell.[38]  Mr. Earskine told Ms. Bell that the deck was "bad," and he told the managers that the roof was becoming dangerous because the leaks trapped water on top of the deck, and the more water stayed on the deck, the worse it would get.[39]

Although defendant Susan Bell informed defendants REC I and JPP that the roof of the Dollar General needed to be replaced in every management report she prepared for the owners of the Blue Springs Village Shopping Center between January and August of 2009, defendants did not take action.[40]  Tip Top Roofing made

---

[37] *Id.* at 21 (emphasis in original) (alterations supplied).

[38] Doc. no. 56-2 (Deposition of Sammie Earskine), at 43-44, 47-48, 58-60, 62-64, 84.

[39] *Id.*

[40] Doc. no. 59-6 (2009 Management Reports).

one last attempt to repair the Dollar General roof in July of 2009, which required that roofers traverse the roof with heavy equipment.[41]  However, because Tip Top Roofing had been working on the roof for the five previous years, its roofers already knew where the deck had deteriorated, and were able to work around the damage.[42]

   After Tip Top Roofing went out of business in December of 2010, defendant Susan Bell testified that the Blue Springs Village Shopping Center did not have a roofer until she hired Mr. Shaneyfelt in July of 2011.[43]  However, Teresa Sanders, a Dollar General employee, was confident that the store's roof had been inspected by multiple roofers in 2010 and 2011.[44]  Thus, assuming that the roof continued to leak between Tip Top Roofing's last repair in 2009, and Mr. Shaneyfelt's first repair in 2011, the parties have presented conflicting evidence on whether those leaks were addressed.[45]

## D.   Mr. Shaneyfelt's Work on the Dollar General Roof

   Mr. Shaneyfelt was an independent roofing subcontractor with All-Star

---

   [41] Doc. no. 56-1 (Deposition of Susan Bell), at 56-61, 67-69; doc. no. 56-2 (Deposition of Sammie Earskine), at 44-48, 96; doc. no. 59-1 (DGM 2009-2011 Roof Work History).

   [42] *See* doc. no. 43-2 (Deposition of Susan Bell), at 67-69; doc. no. 43-9 (Deposition of Sammie Earskine), at 44-48, 96.

   [43] Doc. no. 43-2 (Deposition of Susan Bell), at 65-66.

   [44] Doc. no. 50-1 (Deposition of Teresa Sanders), at 33, 35-36, 46.

   [45] *See* doc. no. 43-2 (Deposition of Susan Bell), at 56-61; doc. no. 50-1 (Deposition of Teresa Sanders), at 33, 35-36, 46; doc. no. 49-2 (Deposition of Bruce Akers), at 26.

Roofing and Construction, LLC ("All-Star Roofing"), an entity that focused on the repair and installation of residential roofing, did not hold a general contractor's license, and was not qualified to perform commercial roofing (such as the roofing at issue in this action) of more than $50,000 in value.[46]  By dedicating his post-high school career exclusively to roofing, Mr. Shaneyfelt had amassed over twenty years of experience in that trade.[47]  Because foul weather often causes roof damage, and creates the need for roofers, Mr. Shaneyfelt frequently "chased storms" in search of work.[48]  He arrived in Huntsville shortly after tornados struck the area in April of 2011.[49]

Four months later, defendant Susan Bell contracted with All-Star Roofing to repair leaks in the roof of another tenant at the Blue Springs Village Shopping Center.[50]  As All-Star Roofing's subcontractor, Mr. Shaneyfelt became the only roofer to work at the shopping center until his fall on October 12 of the same year.[51]  Because the Dollar General retail store at issue was located in Huntsville, Alabama, whereas Ms. Bell resided in Alpharetta, Georgia, performed the job duties of a

---

[46] Doc. no. 43-4 (Deposition of Adam Brooks), at 18-19, 31-32, 34.

[47] *Id.* at 36-37, 97-98; doc. no. 43-6 (Deposition of Lori Jane Shaneyfelt), at 30-32.

[48] Doc. no. 43-4 (Deposition of Adam Brooks), at 29-30.

[49] *Id.* at 18-19.

[50] Doc. no. 43-2 (Deposition of Susan Bell), at 64.

[51] *Id.* at 65-66.

property manager from her home office, and only visited the shopping center on a quarterly basis, Mr. Shaneyfelt and Ms. Bell communicated primarily through e-mail.[52]

On August 26, 2011, defendant Susan Bell sent Mr. Shaneyfelt an e-mail to inform him that Dollar General employees had reported several leaks in the roof of the store.[53]   Ms. Bell asked Mr. Shaneyfelt to interview the manager, examine the leaks, and estimate the cost of repairs.[54]   Ms. Bell's e-mail did not mention that in 2004, the roof had deteriorated to the extent that water was pouring through the deck onto the floor, which essentially required the installation of a new roof in a 50 square foot area of the store;[55] nor did she disclose that, in 2009, Tip Top Roofing Contractor Sammie Earskine had told Ms. Bell that the deck was "bad," and showed her the rust on the deck, including the rust in the area through which Mr. Shaneyfelt later fell.[56]

Upon receiving defendant Susan Bell's e-mail regarding the leaks in the Dollar General roof, Mr. Shaneyfelt agreed to photograph the areas, "trouble shoot" the

---

[52] Doc. no. 1 (Complaint) ¶ 2; doc. no. 43-2 (Deposition of Susan Bell), at 8-9, 69-70.

[53] Doc. no. 43-2 (Deposition of Susan Bell), at 68-69; doc. no. 43-7 (E-Mail Dated Aug. 26, 2011 from Susan Bell to Dan Shaneyfelt), at JPP 0038-39.

[54] *Id.*

[55] Doc. no. 56-1 (Deposition of Susan Bell), at 37; doc. no. 56-2 (Deposition of Sammie Earskine), at  26, 58-61; doc. no. 59-4 (2004 Roof and Deck Replacement).

[56] Doc. no. 56-2 (Deposition of Sammie Earskine), at 43-44, 47-48, 58-60, 62-64, 84.

leaks, and provide Ms. Bell with an estimate for the repairs.[57]  When Mr. Shaneyfelt arrived at the store, he requested a history of the leaks from Dollar General manager Teresa Sanders, but she testified that she was not sure how long they had existed.[58] At the time of Mr. Shaneyfelt's visit, the underside of the deck was visible from the floor of the store through gaps in the ceiling tiles, but the view was obstructed by duct work and support beams, and Mr. Shaneyfelt did not remove any ceiling tiles to improve visibility.[59]

Four days later, on August 30, 2011, Mr. Shaneyfelt sent defendant Susan Bell an e-mail that proposed the same solution as the one that Centimark, a national roofing contractor, had suggested in April of 2009: that is, to replace the Dollar General roof.[60]  The e-mail did not mention the condition of the deck.[61]  Mr. Shaneyfelt based his recommendation on diagrams of three major leaks on the main floor and two in the back storeroom, one of which corresponded with the area of the

---

[57] Doc. no. 43-2 (Deposition of Susan Bell), at 68-69; doc. no. 43-7 (E-Mail Dated Aug. 26, 2011 from Susan Bell to Dan Shaneyfelt), at JPP 0038-39.

[58] Doc. no. 50-1 (Deposition of Teresa Sanders), at 21-22, 32, 64-67.

[59] Doc. no. 43-18 (Photographs Attached to E-Mail Dated Aug. 30, 2011 from Dan Shaneyfelt to Susan Bell), at Shaneyfelt 150; doc. no. 50-1 (Deposition of Teresa Sanders), at 20-21, 28-29, 54-55; doc. 53-1 (Deposition of Matt Sams), at 35; doc. 54-1 (Kachele Roof Decking Condition Investigation), at JPP 242.

[60] *Compare* doc. no. 43-8 (E-Mail Dated Aug. 30, 2011 from Dan Shaneyfelt to Susan Bell), at JPP 0037 *with* doc. no. 57-1 (2009 Roof Replacement Proposals), at 21.

[61] *See* doc. no. 43-8 (E-Mail Dated Aug. 30, 2011 from Dan Shaneyfelt to Susan Bell).

storeroom through which he later fell,[62] and on photographs from the floor of the store, some of which showed parts of the underside of the deck as seen through the gaps in the ceiling tiles, but none of which depicted rusted decking.[63]

In his August 30 e-mail to defendant Susan Bell, Mr. Shaneyfelt also noted that, after measuring and photographing the worst leaks from inside the Dollar General, he continued the inspection by climbing onto the roof of the store, where he measured and photographed the major leaking areas and prior repair attempts.[64]  Mr. Shaneyfelt reported that, "over the years," other roofers had made repairs that temporarily stopped the leaks by "chas[ing] [them] to a different spot," and that some of the repairs had created "[d]am-like areas that probably [held] water" and caused "air pockets" in the roofing membrane, likely from the use of products not compatible with the materials in the roof.[65]

During his inspection of the Dollar General roof, Mr. Shaneyfelt was

---

[62] *Id.* at JPP 0037; doc. no. 43-15 (Dan Shaneyfelt Dollar General Diagram), at JPP 0033; doc. no. 43-16 (Deposition of Barry Leach), at 111-12; doc. no. 43-17 (Deposition of Matthew Sams), at 138-39.

[63] Doc. no. 43-8 (E-Mail Dated Aug. 30, 2011 from Dan Shaneyfelt to Susan Bell); doc. no. 43-18 (Photographs Attached to E-Mail Dated Aug. 30, 2011 from Dan Shaneyfelt to Susan Bell), at Shaneyfelt 149-52; doc. no. 52-1 (Deposition of Ben Hixson), at 61.

[64] Doc. no. 43-8 (E-Mail Dated Aug. 30, 2011 from Dan Shaneyfelt to Susan Bell); doc. no. 18 (Photographs Attached to E-Mail Dated Aug. 30, 2011 from Dan Shaneyfelt to Susan Bell).

[65] *Id.* (alterations supplied).

accompanied by Adam Brooks, the owner of All-Star Roofing.[66]   Because his company generally performed residential roofing, Mr. Brooks did not "know much about commercial roofing," and did not consider himself qualified to offer an opinion on its condition.[67]   Thus, rather than supervising Mr. Shaneyfelt's work, Mr. Brooks came at Mr. Shaneyfelt's request to assist with the *measurement* of the leaks.[68]   Even so, Mr. Brooks, like Mr. Shaneyfelt, climbed onto the roof and noted the existence of an "air pocket" that measured six to eight square inches and appeared to have "a little water under it."[69]

Three weeks after e-mailing defendant Susan Bell the results of his inspection of the Dollar General roof, Mr. Shaneyfelt e-mailed her an estimate for addressing the roof's frequent leaks.[70]   Mr. Shaneyfelt offered Ms. Bell two alternatives: *i.e.*, to repair the leaks for $45,000, subject to a one-year warranty; or to recover the entire roof for $152,000, subject to a five-year warranty.[71]   Again, the e-mail did not mention the condition of the deck.[72] Although All-Star Roofing was not licensed as

---

[66] Doc. no. 43-4 (Deposition of Adam Brooks), at 52-53, 59.

[67] *Id.* at 18-19, 31-32, 34, 62.

[68] *Id.* at 52.

[69] *Id.* at 52-53, 59-61.

[70] Doc. no. 43-21 (E-Mail Dated Sept. 23, 2011 from Dan Shaneyfelt to Susan Bell), at JPP 0032.

[71] *Id.*; doc. no. 43-23 (Estimate), at JPP 0034-36.

[72] *See id.*

a general contractor, and could not perform commercial roofing of more than $50,000 in value, Mr. Shaneyfelt's estimate listed All-Star Roofing as the entity that would warranty the labor.[73]

The following month, on October 12, 2011, defendant Susan Bell sent Mr. Shaneyfelt an e-mail apparently quoting a message from the corporate office of defendant Dolgencorp, which operated the Dollar General retail store, to defendant JPP, which managed the Blue Springs Village Shopping Center.[74]  In the message, Dolgencorp stated:

> Please have technicians dispatched for roof leaks. — Bruce/Mgr at the site states they have 4 roof leaks in the store.  2 are pretty bad.  He states that there is 1 one sales floor toward the back and 1 in the stock room - these are the bad 2.  They do have buckets down and wet floor signs.[75]

Accordingly, Ms. Bell instructed Mr. Shaneyfelt that:

> Dollar General Corporate - reported the following leaks.  Please see Bruce the store manager to discuss the 4 leaks and let me know what we can do for cheap repairs to these areas (See below) as we do not have funds to replace roof at this time.[76]

Later that day, while Mr. Shaneyfelt was assessing the leaks from the top of the

---

[73] Doc. no. 43-4 (Deposition of Adam Brooks), at 72; doc. no. 43-21 (E-Mail Dated Sept. 23, 2011 from Dan Shaneyfelt to Susan Bell).

[74] Doc. no. 43-24 (E-Mail Dated Oct. 12, 2011 from Susan Bell to Dan Shaneyfelt), at JPP 0031.

[75] *Id.*

[76] *Id.*

Dollar General roof, a portion of the deck gave way, and he fell through the roof into the storeroom.[77]  Mr. Shaneyfelt died from injuries sustained in his fall.[78]

**E.    Evidence of the Condition of the Roof on the Day of the Fall**

After Mr. Shaneyfelt's death, plaintiff retained two experts, Matt Sams and Barry Leach.[79]  Mr. Leach testified that the rust on the Dollar General deck was visible from some points on the floor of the store.[80]  However, one Dollar General employee testified that the rust on the deck was not visible from the floor of the storeroom,[81] and another employee testified that the deck itself was not visible from the floor in the area of the storeroom where Mr. Shaneyfelt fell.[82]

In any event, plaintiff's experts agreed that the presence of rust on the *surface* of a deck does not necessarily indicate that the deck is structurally unsound.[83] Accordingly, expert Matt Sams testified that the deck's "structural inadequacies . . . were not obvious to Mr. Shaneyfelt on the day of the accident."[84]  Even so, expert

---

[77] Doc. no. 22 (Amended Complaint) ¶ 3.

[78] *Id.*

[79] Doc. no. 43-16 (Deposition of Barry Leach), at 6; doc. no. 43-17 (Deposition of Matt Sams), at 7.

[80] Doc. no. 16 (Deposition of Barry Leach), at 55-57, 149-50.

[81] Doc. no. 49-2 (Bruce Akers), at 43-44.

[82] Doc. no. 50-1 (Deposition of Teresa Sanders), at 38.

[83] Doc. no. 43-16 (Deposition of Barry Leach), at 150-51, 157; doc. no. 53-1 (Deposition of Matt Sams), at 43-45.

[84] Doc. no. 53-1 (Deposition of Matt Sams), at 51-55.

Barry Leach testified that, based upon Mr. Shaneyfelt's years of experience, he should have recognized that rust can weaken a metal deck over the long term.[85]

As further evidence of the condition of the Dollar General roof, The Kachele Group of consulting structural engineers ("Kachele") "provide[d] a visual engineering assessment of the roof structure" at the Dollar General and other spaces at the Blue Springs Village Shopping Center.[86]   To conduct their examination, Kachele employees used scissor lifts to access the undersides of the ceilings, including the area of the Dollar General roof where Mr. Shaneyfelt fell.[87]

Inside the Dollar General, the engineers found "[f]ully deteriorated roof decking . . . in areas with intact paint surfaces and surfaces evidencing only tiny pinholes or blemishes on the painted surfaces.  These were identified by random pushing up from below."[88]  More specifically:

> We observed many gradations of the severity of the corrosion of the roof decking, which illustrated a full spectrum of stages in the degradation of the decking.  The corrosion began with little to no visible indication from below, but which was detectible by pushing on the decking from below.  In a location approximately 2' from visibly corroded roof decking but itself showing no signs of distress, we were able to push on the underside of the roof decking with hand pressure and

[85] Doc. no. 43-16 (Deposition of Barry Leach), at 207.

[86] Doc. no. 49-1 (Contech Services Roof Condition Investigation), at JPP 265 (alteration supplied).

[87] Doc. no. 54-1 (Kachele Roof Decking Condition Investigation), at JPP 242.

[88] *Id.* at 244 (alteration supplied).

cause the roof decking to crush and crack.

The first visible stage of corrosion was the formation of pinholes in the valleys of the roof decking.  They appeared as brown dots, but with light pressure (using a broom handle) we easily pushed through the decking.  After puncturing one of the pinholes, water started seeping from it.  As the corrosion expanded, the pinholes grew closer together, until they severed the valleys of the roof decking, exposing the substrate of the roofing above.

The specific areas exhibiting obvious severe corrosion of the steel roof decking were as follows:  northwestern area of [the Dollar General] (approximately 25' x 40'); southeastern area of [the Dollar General] (approximately 20' x 30') where [Mr. Shaneyfelt's] fall occurred; northeastern area of [the Dollar General] (approximately 10' x 20'); and the northeastern area of [another store] (approximately 15'x15').

Roof Decking Analysis

Approximately 6% of the roof of [the Dollar General] and approximately 3% of the roof of [the other store] are in obvious advanced stages of corrosion and should be immediately considered incompetent and unsafe.  [The Dollar General] has many other less severe visibly corroded sections of roof decking, while the majority of the store (as observed through limited scissors-lift access points) shows no significant visible signs of corrosion in the painted underside of the roof decking.

Based on the fact that even an area evidencing no paint damage from below has corroded to the point that hand pressure pushed through the metal decking, we do not consider the deck's visual appearance to be a sufficient indicator of the adequacy of the metal decking.  Because the corrosion of the roof decking initiates on the top surface of the decking that is hidden from observation, there is no way to know for certain the true condition of the roof decking (without first removing all of the roofing materials).  However, based on the typical construction and conditions observed, we consider it likely that the entire decking

system has been weakened by at least some degree of corrosion.  Owing to the likely presence of water trapped in its valleys, the roof decking continues to corrode in areas that are not visible at this time.[89]

## III.  MOTION TO EXCLUDE A PORTION OF THE EVIDENCE OFFERED BY PLAINTIFF'S EXPERTS

Defendants REC I/Blue Springs Limited Partnership, JP Properties, Inc., and Susan Bell (collectively, the "Blue Springs defendants") moved to exclude a portion of the evidence offered by plaintiff's experts, Matt Sams and Barry Leach.[90]  Those defendants argue that both experts have "offered opinions that will not assist the trier of fact in determining a fact in issue and are not based upon their respective education, training, or experiences."[91]

### A.   The Requirements of Federal Rule of Evidence 702

Federal Rule of Evidence 702, pertaining to opinion testimony offered by so-called "expert witnesses," was most recently revised by amendments that became effective on December 1, 2011.  The present version of the rule reads as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to

---

[89] *Id.* at 243-44 (alterations supplied).

[90] *See* doc. no. 46 (Motion to Exclude).

[91] *Id.* at 2.

21

determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[92]  That rule compels district courts to perform "gatekeeping" functions when determining the admissibility of expert scientific and technical evidence.  *See, e.g., United States v. Abreu*, 406 F.3d 1304, 1306 (11th Cir. 2005) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*)).

---

[92] According to the Advisory Committee Notes accompanying the present version of Rule 702, the rule was amended "as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules.  These changes are intended to be stylistic only.  There is no intent to change any result in any ruling on evidence admissibility."

The former version of Rule 702, as amended in 2000, in response to the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997); and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), read as follows:

**Rule 702.  Testimony by Experts**

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (version in effect prior to Dec. 1, 2011).

"This function inherently requires the trial court to conduct an exacting analysis of

the foundations of expert opinions to ensure they meet the standards for admissibility

under Rule 702." *Id.* (internal quotation omitted).

> [T]he objective of that requirement is to ensure the reliability and
> relevancy of expert testimony.  It is to make certain that an expert,
> whether basing testimony upon professional studies or personal
> experience, employs in the courtroom the same level of intellectual rigor
> that characterizes the practice of an expert in the relevant field.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (alteration supplied).

"The inquiry . . . is a flexible one" because, in any given case, "[m]any factors will

bear on the inquiry, and . . . [there is no] definitive checklist or test."  *Daubert v.*

*Merrell  Dow  Pharmaceuticals,  Inc.*, 509  U.S.  579,  593-94  (1993)  (alterations

supplied).  Factors that may be relevant include:

> (1) whether the theory or technique can be (and has been) tested, (2)
> whether the theory or technique has been subjected to peer review and
> publication, (3) in the case of a particular . . . technique, the known or
> potential rate of error, and (4) whether the theory or technique is
> generally accepted by the relevant . . . community.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010)

(internal quotation marks and alterations omitted).[93]

---

[93] Additional factors that may be taken into account by a district court include:

> (1) Whether the expert is proposing to testify about matters growing naturally
> and directly out of research he has conducted independent of the litigation, or
> whether he has developed his opinion expressly for purposes of testifying;

23

With regard to the requirement that the proffered expert testimony assist "the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, the Eleventh Circuit has held that such "testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63 (11th Cir. 2004). Accordingly, "[a]n expert may not . . . testify to the legal implications of conduct; the court must be the jury's only source of law." *Nicholson v. McCabe*, No. CV-02-H-1107-S, 2003 WL 25676474, *1 (N.D. Ala. June 2, 2003) (alteration supplied) (citing *Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)). Likewise, "'[a]n expert may not . . . merely tell the jury what result to reach.'" *Id.* (alteration supplied) (quoting *Montgomery*, 898 F.2d at 1541).

Plaintiff has disclosed two experts: Barry Leach, a professional with thirty-nine years of commercial roofing experience; and Matt Sams, a North Carolina-based,

---

(2) Whether the expert has unjustifiably extrapolated from an accepted to an unfounded conclusion;

(3) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(4) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee's note to 2000 amends. (internal citations omitted).

licensed civil engineer with a structural engineering and construction background.[94]
Neither Mr. Leach nor Mr. Sams has any education, training, or experience as a
property manager.[95]  Further, Mr. Sams has never worked as a commercial roofer, and
has no experience or training in commercial roofing.[96]

Rather than requesting "that Sams and Leach be completely excluded from
testifying," the Blue Springs defendants "seek only to exclude (1) Sams' [sic] and
Leach's testimony and opinions related to the duties owed by a property manager to
a roofing contractor, and the alleged breach thereof; and (2) Sams' [sic] testimony and
opinions regarding the duties and reasonableness of actions taken by a commercial
roofer."[97]   The Blue Springs defendants argue that, "[l]acking the required
'knowledge, skill, experience, training, or education' as property managers means that
neither Sams nor Leach are qualified to testify that Defendants owed any duty to Mr.
Shaneyfelt, much less that they breached any such duty."[98]   Similarly, those

---

[94]  Doc. no. 47-1 (Expert Report of Barry Leach); doc. no. 43-17 (Deposition of Matt Sams),
at 71.

[95]  *See* doc. no. 43-16 (Deposition of Barry Leach), at 188-89; doc. no. 73-17 (Deposition of
Matt Sams), at 60-61.

[96]  Doc. no. 43-17 (Deposition of Matt Sams), at 77, 83.

[97]  Doc. no. 65 (Reply in Support of Motion to Exclude), at 3 (alterations supplied).  For
example, the Blue Springs defendants do *not* seek to exclude the testimony of plaintiff's experts
"regarding what contractors and engineers expect from property owners and property managers."
*Id.* at 4.  Defendants also acknowledge that Mr. Sams "is likely qualified to testify regarding the
structural integrity of the Dollar General roof and the factors that may have affected such integrity."
*Id.* at 7.

[98]  *Id.* at 4 (alteration supplied).

25

defendants assert that Mr. Sams's "education, skills, and experiences as a structural engineer and in the construction industry do not qualify him to testify as an expert with regard to the knowledge, actions, and expectations of a commercial roofer."[99] According to the Blue Springs defendants, "[t]he testimony and opinions sought to be excluded. . . are nothing more than Sams' and Leach's opinions regarding the legal implications of Defendants' conduct."[100]

Indeed, plaintiff's experts have offered a number of legal conclusions regarding the issues of whether plaintiff has established her claim of negligence, and whether defendants have established their affirmative defenses.   Plaintiff's experts have offered opinions about such questions of law as the following:  whether defendants owed Mr. Shaneyfelt a duty[101] whether defendants breached that duty;[102] whether Mr. Shaneyfelt's actions were "reasonable";[103] and whether the defect in the Dollar General roof was "open and obvious."[104]   While experts may offer their opinions on

---

[99] *Id.* at 7.

[100] *Id.* at 8 (alteration supplied).

[101] *See, e.g.*, doc. no. 47-1 (Expert Report of Barry Leach) ¶ 3 ("Employees of Dollar General and J.P. Properties had a duty to warn Mr. Shaneyfelt of the roof's weakened condition.").

[102] *See, e.g.*, doc. no. 47-2 (Expert Report of Matt Sams) ¶ 13 ("It was not reasonable for the property owner/manager to allow the metal deck to deteriorate until it had little to no capacity.").

[103] *See, e.g., id.* ¶ 16 ("Given the absence of any warnings regarding safety or diminished deck capacity, it was reasonable for Mr. Shaneyfelt to walk upon the subject roof in response to the property manager/owner's request for roof remedies.").

[104] *See, e.g.*, doc. no. 47-1 (Expert Report of Barry Leach) ¶ 1 ("The defect in the area of the roof from which Mr. Shaneyfelt fell was not, and should not have been, open and obvious to Mr.

ultimate issues of *fact*, they may not testify about conclusions of *law*, such as the "legal implications of conduct." *Nicholson*, 2003 WL 25676474, at *1 (citing *Montgomery*, 898 F.2d at 1541). Accordingly, this court will grant the motion to exclude the opinions of plaintiff's experts' regarding the issues of whether the parties have established their claims and defenses.

## IV.  MOTION TO STRIKE AN AFFIRMATIVE DEFENSE ASSERTED BY THE BLUE SPRINGS DEFENDANTS

Plaintiff has moved to strike the Blue Springs defendants' affirmative defense that the defect in the Dollar General roof was "open and obvious" because those defendants did not assert that defense in their answers to plaintiff's complaint before they raised that defense in their summary judgment motion.[105]  Federal Rule of Civil Procedure 8(c) provides that, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."  Fed. R. Civ. P. 8(c) (alteration supplied).  "[F]ailure to plead an affirmative defense generally results in a waiver of that defense."  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010) (alteration supplied) (citing *Jackson v. Seaboard C. L. R. Co.*, 678 F.2d 992, 1012 (11th Cir. 1982)).

---

Shaneyfelt.").

[105] *See* doc. no. 58 (Motion to Strike), at 3; *see also* doc. no. 27 (Answer to Amended Complaint by Susan Bell); doc. no. 28 (Answer to Amended Complaint by J.P. Properties, Inc.); doc. no. 29 (Answer to Amended Complaint by REC I/ Blue Springs Limited Partnership).

The Blue Springs defendants claim that the openness and obviousness of a danger is not an affirmative defense, but "a question of the duty owed" implicated by their affirmative defenses of contributory negligence and risk assumption.[106]  While those defendants are correct that the argument that a defect is "open and obvious" may be relevant to other affirmative defenses, multiple federal and state courts have held that the argument is also, itself, an affirmative defense.[107]  The Blue Springs defendants claim that "none of those cases involve an independent contractor,"[108] but they cite no authority for the proposition that a plaintiff's employment status can transmute a defense's affirmative nature.  Indeed, defendant Dolgencorp *did* assert openness and obviousness as an affirmative defense.[109]

Having held that the "argument that the condition that caused [a] fall was open and obvious is an affirmative defense," *Arnold v. Wal-Mart Stores, Inc.*, No.

---

[106] Doc. no. 62 (Response to Motion to Strike), at 2, 7.

[107] *See, e.g.*, *Arnold v. Wal-Mart Stores, Inc.*, No. 2:08-CV-1021-WC, 2009 WL 4827389, *14 (M.D. Ala. Dec. 10, 2009) (quoting *Dolgencorp, Inc. v. Taylor*, 28 So. 3d 737, 742 (2009)) ("[A defendant's] argument that the condition that caused [a plaintiff's] fall was open and obvious is an affirmative defense[.]") (alterations supplied); *Clemons v. Wal-Mart Stores, Inc.*, No. 06-0755-WS-B, 2007 WL 2412908, *13 (S.D. Ala. Aug. 20, 2007) (quoting *Denmark v. Mercantile Stores Co.*, 844 So. 2d 1189, 1194 (2002)) ("A premises owner's contention that the condition resulting in an invitee's injury was open and obvious 'is an affirmative defense[.]'") (alteration supplied); *Clemons*, 2007 WL 2412908 at *13 (quoting *Fred's Department Store v. Paschal*, 923 So. 2d 1125, 1128-29 (Ala. Civ. App. 2005)) ("The store's argument that the condition that caused the customer's fall was open and obvious is an affirmative defense[.]") (alteration supplied).

[108] Doc. no. 62 (Response to Motion to Strike), at 5.

[109] *See* doc. no. 30 (Answer to Amended Complaint by Dolgencorp, LLC).

28

2:08-CV-1021-WC, 2009 WL 4827389, *14 (M.D. Ala. Dec. 10, 2009) (quoting

*Dolgencorp, Inc. v. Taylor*, 28 So. 3d 737, 742 (2009)), this court must address the

Blue Springs defendants' request to amend their answers to assert that defense.[110]

Plaintiff filed her complaint against the Blue Springs defendants on December

30, 2011, and those defendants filed their answers on February 1, 2012, without

raising the "open and obvious" defense.[111]  This court entered a scheduling order on

March 19, 2012, providing that "[n]o causes of action, *defenses* or parties may be

added after May 10, 2012."[112]  Plaintiff moved for leave to amend her complaint to

add Dolgencorp as a defendant on May 8, 2012, and this court granted the motion on

May 18 of the same year.[113]  The Blue Springs defendants filed their answers to

plaintiff's amended complaint on June 19, 2012, but once again they did not plead the

"open and obvious" defense.[114]  More than eight months later, those defendants filed

a motion for summary judgment, in which they asserted that defense for the first

---

[110] *Id.* at 9.

[111] *See* doc. no. 1 (Complaint); doc. no. 8 (Answer to Complaint by REC I/ Blue Springs Limited Partnership); doc. no. 9 (Answer to Complaint by J.P. Properties, Inc.); doc. no. 10 (Answer to Complaint by Susan Bell).

[112] Doc. no. 17 (Scheduling Order), at 1 (emphasis supplied).

[113] *See* doc. no. 19 (Motion for Leave to File Amended Complaint); doc. no. 21 (Order); doc. no. 22 (Amended Complaint).

[114] *See* doc. no. 27 (Answer to Amended Complaint by Susan Bell); doc. no. 28 (Answer to Amended Complaint by J.P. Properties, Inc.); doc. no. 29 (Answer to Amended Complaint by REC I/ Blue Springs Limited Partnership).

time.[115]

> "Both Rules 15 and 16 of the Federal Rules of Civil Procedure facially guide the court's decision whether to allow an untimely amendment to the [pleadings]." *Nobles v. Rural Cmty. Ins. Servs.*, 303 F. Supp. 2d 1279, 1283 (M.D. Ala. 2004) (Thompson, J.). Rule 15 provides that, "A party may amend its pleadings once as a matter of course within:  (A) 21 days after serving it, or (B) . . . 21 days after service of a responsive pleading or 21 days after service of a motion under [Fed. R. Civ. P.] 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1).  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).  Rule 15 states that, "The court should freely give leave *when justice so requires*." *Id.* Rule 16, on the other hand, requires the district court to issue a scheduling order that "limit[s] the time to . . . amend the pleadings." Fed. R. Civ. P. 16(b)(3)(A).  Once such an order has been issued, the "schedule may be modified *only for good cause*." Fed. R. Civ. P. 16(b)(4).

*Sorrells v. Lake Martin, Inc.*, No. 3:09-CV-710-MHT, 2011 WL 627049, *3-4 (M.D. Ala. Feb. 14, 2011) (alterations in original) (emphasis supplied).  In light of Rules 15 and 16, the Eleventh Circuit has adopted two, seemingly incompatible approaches to untimely, affirmative defenses.  In one line of cases:

> "The Eleventh Circuit Court of Appeals has found that Rule 16's good-cause standard governs a party's ability to amend [its pleading] after the district court has entered a scheduling order." *Nobles*, 303 F. Supp. 2d at 1283 (citing *Sosa v. Airprint Sys.*, 133 F.3d 1417, 1418 n.2 (11th Cir. 1998)).  "It is only after the court addresses whether the proposed amendment may be granted under Rule 16 that the court is to

---

[115] *See* doc. no. 43 (Motion for Summary Judgment by REC I/Blue Springs Limited Partnership, JP Properties, Inc., and Susan Bell); doc. no. 44 (Brief in Support of Motion for Summary Judgment by REC I/Blue Springs Limited Partnership, JP Properties, Inc., and Susan Bell).

> determine whether it is proper under Rule 15." *Id.* "If [the court]
> considered only Rule 15(a) without regard to Rule 16(b), [it] would
> render scheduling orders meaningless and effectively would read Rule
> 16(b) and its good cause requirement out of the Federal Rules of Civil
> Procedure." *Sosa*, 133 F.3d at 1419.

*Sorrells*, 2011 WL 627049, at *4-5 (alterations in original). Rule 16(b) *requires* compliance with the good cause requirement, *Smith v. School Board of Orange County*, 487 F.3d 1361, 1367 (11th Cir. 2007), and "*precludes* modification unless the schedule *cannot* 'be met despite the diligence of the party seeking the extension.'" *Sosa*, 133 F.3d at 1418 (emphasis supplied) (citing Fed. R. Civ. P. 16 advisory committee's note). The Eleventh Circuit has taken this approach as recently as 2007 and, in an unpublished opinion, 2013. *See Millennium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1299 (11th Cir. 2007); *International Ship Repair & Marine Services v. Northern Assurance Co. of America*, No. 12-11717 & 12-12136, 2013 WL 28380, *2-3 (11th Cir. Jan. 3, 2013).

A second line of cases holds that "if a plaintiff receives notice of an affirmative defense by some means other than pleadings, 'the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice.'" *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir. 1989) (quoting *Hassan v. U.S. Postal Service*, 842 F.2d 260, 263 (11th Cir. 1988)). "In a case like this one, *the reality of notice and the reality of prejudice in fact must be considered*." *Proctor v. Fluor Enterprises*, 494

F.3d 1337, 1352 (11th Cir. 2007) (emphasis supplied).[116]  The Eleventh Circuit has

taken this approach as recently as 2012.  *See Pensacola Motor Sales, Inc. v. Eastern*

*Shore Toyota, LLC*, 684 F.3d 1211, 1222 (11th Cir. 2012).  Neither line of cases has

expressly overruled the other.

Out of an abundance of caution, this court will analyze the Blue Springs

defendants' motion under both standards.  To the extent that a party seeking to raise

an affirmative defense after the expiration of the scheduling order deadline must show

"good cause" for its delay, *see, e.g., Sosa*, 133 F.3d at 1418 n.2, the Blue Springs

defendants have not done so.[117]

To the extent that a party seeking to belatedly assert an affirmative defense may

prevail by showing the presence of notice and absence of prejudice, *see Proctor v.*

*Fluor Enterprises*, 494 F.3d 1337, 1352 (11th Cir. 2007), the Blue Springs defendants

have argued that "Plaintiff's counsel has always understood that the open and obvious

nature of the defect would be an issue."[118]  However, the fact that plaintiff's counsel

understood that openness and obviousness would be "an issue" with regard to the

---

[116] In contrast to the Eleventh Circuit's approach in *Proctor*, a district court following the approach in *Sosa* has held that "the standard for allowing an amendment after the Rule 16(b) deadline has expired is 'good cause,' *not lack of prejudice*."  *United States v. Contents of Bank of America Account No. 9163*, No. 10-0560-CG-B, 2012 WL 3641456, *1-2 (S.D. Ala. Aug. 23, 2012) (emphasis supplied).

[117] *See* doc. no. 62 (Reply to Motion to Strike), at 9-11.

[118] *Id.* at 10.

Blue Springs defendant's *other* affirmative defenses, and with regard to *Dolgencorp's* "open and obvious" defense, does not establish that plaintiff's counsel understood the Blue Springs defendants *to have raised openness and obviousness <u>as an affirmative</u> <u>defense</u>*.

Further, plaintiff alleges that the Blue Springs defendants made a conscious decision to defend this action by denying all knowledge of the condition of the Dollar General roof,[119] thereby forcing plaintiff to spend "a substantial amount of time, energy, and resources locating and deposing independent witnesses that prove the Defendants did have knowledge of the deteriorated condition of the roof."[120]  Now that plaintiff has expended her resources to defeat those defendants' original defense, she alleges that she would be prejudiced by their belated attempt to try a new tactic.[121] For all of those reasons, this court will grant plaintiff's motion to strike the Blue Springs defendants' affirmative defense that the defect in the Dollar General roof was "open and obvious."

## V.  MOTION FOR SUMMARY JUDGMENT

---

[119] *See* doc. no. 56-1 (Deposition of Susan Bell), 8, 30-31, 73-74, 100-03; *see also* doc. no. 59 (Response to Motion for Summary Judgment by REC I/Blue Springs Limited Partnership, JP Properties, Inc., and Susan Bell), at 17-23.

[120] *See* doc. no. 54-2 (Deposition of Heath Jones); doc. no. 55-1 (Deposition of Shawn Terry); doc. no. 56-2 (Deposition of Sammie Earskine); doc. no. 64-1 (Deposition of Elke Coleman).

[121] *Id.*

The Blue Springs defendants and Dolgencorp have each moved for summary judgment.[122]  To prove that defendants caused the wrongful death of Mr. Shaneyfelt through negligence or wantonness under Alabama law, plaintiff must show that defendants "owed him a duty, breached that duty, and injured him as a result of that breach." *Kendrick v. Alabama Power Co.*, 601 So. 2d 912, 914 (Ala. 1992) (citing *Alabama Power Co. v. Smith*, 409 So. 2d 760, 764 (Ala. 1982)).  "The determination of the existence of a duty is a question for the court."  *Id.*

The Blue Springs defendants deny the existence of a duty to Mr. Shaneyfelt because "Alabama law is clear [that] 'a premises owner . . . owes no duty of care to employees . . . of an independent contractor . . . with respect to working conditions.'"[123]  In support, the Blue Springs defendants cite *Calloway v. PPG Industries, Inc.,* 155 Fed. App'x 450, 452 (11th Cir. Nov. 18, 2005); *Weeks v. Alabama Electric Cooperative, Inc.,* 419 So. 2d 1381, 1383 (Ala. 1982); *Kendrick*, 601 So. 2d at 914; and *Pope v. City of Talladega*, 602 So. 2d 890 (Ala. 1992).

While the Blue Springs defendants are correct that a premises owner or operator does not generally owe an independent contractor a duty regarding his

---

[122] *See* doc. no. 43 (Motion for Summary Judgment by REC I/Blue Springs Limited Partnership, JP Properties, Inc., and Susan Bell); doc. no. 45 (Motion for Summary Judgment by Dolgencorp, LLP).

[123] Doc. no. 61 (Reply in Support of Motion for Summary Judgment by REC I/Blue Springs Limited Partnership, JP Properties, Inc., and Susan Bell), at 3 (alteration supplied).

*working conditions*, an owner or operator does owe the contractor a duty with regard to *the safety of the premises. See Elder v. E.I. DuPont De Nemours & Co.*, 479 So. 2d 1243, 1248 (Ala. 1985) ("Just as an owner has no liability to an independent contractor for injuries occurring as a result of conditions arising during and in the course of work to be performed, a general contractor has no liability to an independent subcontractor's employee who suffers an injury *where the general contractor did not retain possession or control of the premises*.") (emphasis supplied).

"Under Alabama law, the premises owner is . . . under a duty to employees [of] an independent contractor to maintain the premises in a reasonably safe condition, except with respect to conditions arising in the progress of the work on the contract."[124] *Armstrong v. Aetna Insurance Co.*, 448 So. 2d 353, 355 (Ala. 1983) (alteration supplied) (internal citations omitted).

> [U]nder the law of Alabama, [the] . . . owner of the premises[] owe[s] .
> . . an employee of an independent contractor[] the same duty a property
> owner owes an invitee. This duty, as declared by the Alabama Supreme
> Court in *Claybrooke v. Bently*, 1954, 260 Ala. 678, 72 So.2d 412, is to
> maintain the premises in a reasonably safe condition and that an invitee

---

[124] In its unaltered form, the above quotation states, "Under Alabama law, the premises owner is also under a duty to employees *as* an independent contractor to maintain the premises in a reasonably safe condition, except with respect to conditions arising in the progress of the work on the contract." *Id.* (alteration supplied). However, in the context of the opinion, it appears that the use of the word "as" was a typographical error. For example, the following sentence discusses the duty of "a premises owner to employees *of* independent contractors." *Id.* (emphasis supplied).

assumes all normal or ordinary risks attendant upon the use of the premises; further, that the owner is under no duty to reconstruct or alter his premises to eliminate known or obvious dangers, and that he cannot be held liable for injuries resulting from a dangerous condition which was obvious, or should have been observed in the exercise of reasonable care. *See also Tobler v. Pioneer Mining & Mfg. Co.*, 166 Ala. 482, 52 So. 86.

*Green v. Reynolds Metals Co.*, 328 F.2d 372, 374 (5th Cir. 1964) (alterations supplied);[125] *see also Johns v. Pettibone Corp.*, 769 F.2d 724, 725 (11th Cir. 1985) (assessing a landowner's duty to the employee of an independent contractor under the standard for an invitee); *Bush v. Alabama Power Co.*, 457 So. 2d 350, 354 (Ala. 1984) (same).

In discussing a premises owner's liability towards an independent contractor, this Court has recognized that an "'"owner of premises is not responsible to an independent contractor for injury from defects or dangers which the contractor knows of, or ought to know of."'" *Ex parte Meadowcraft Indus., Inc.*, 817 So. 2d 702, 706 (Ala. 2001) (quoting *Glenn v. United States Steel Corp.*, 423 So. 2d 152, 154 (Ala. 1982), quoting in turn *Veal v. Phillips*, 285 Ala. 655, 657-58, 235 So. 2d 799, 802 (1970)). Moreover, "'[t]here is no duty to warn' … an independent contractor 'who  has equal or superior knowledge of a potential danger.'" *Fielder v. USX Corp.*, 726 So. 2d 647, 650 (Ala. 1998) (quoting *Alabama Power Co. v. Williams*, 570 So. 2d 589, 592 (Ala. 1990)). Rather, a premises owner's duty to warn arises when the owner is aware "'of dangers that are hidden on or inhere in that property.'" *Farr Metal, Inc. v. Hines*, 738 So. 2d 863, 864 (Ala. 1999) (quoting *McGregory v. Lloyd Wood Constr. Co.*, 736 So. 2d 571, 575

---

[125] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

(Ala. 1999), ultimately quoting *Gulf Oil Corp. v. Bivins*, 276 F.2d 753, 758 (5th Cir. 1960) (emphasis omitted)).  A party claiming that a duty to warn existed must show:  "(1) that the defect or danger was 'hidden'; (2) that it was 'known to the owner'; and (3) that it was 'neither known to the contractor, nor such as he ought to know.'"  *Meadowcraft*, 817 So. 2d at 706 (quoting *Glenn v. United States Steel Corp.*, 423 So. 2d at 154).

*Roberts v. Nasco Equipment Co.*, 986 So. 2d 379, 383-84 (Ala. 2007).  Defendants'

arguments on summary judgment go primarily to whether they owed Mr. Shaneyfelt

a duty.

## A.     Was Defendant Dolgencorp an Invitor of Mr. Shaneyfelt?

Defendant Dolgencorp denies owing Mr. Shaneyfelt the duty owed by an

invitor to an invitee because Dolgencorp "was not the owner of the premises

[containing the Dollar General retail store,] and did not invite Shaneyfelt on the

premises [to repair the leaks in its roof].  Moreover, as the lessee, [Dolgencorp] did

not have rights or responsibilities of tending to the roof pursuant to its lease with

REC I."[126]  Instead, argues Dolgencorp, defendants REC I, its property management

company (defendant JPP), and JPP's director of operations (defendant Susan Bell),

were responsible for maintaining the property.[127]

---

[126] Doc. no. 45-2 (Brief in Support of Motion for Summary Judgment by Dolgencorp, LLP), at 4 (alteration supplied).

[127] Doc. no. 43-1 (Deposition of Andrea Plotkin), at 9-10, 16; doc. no. 43-2 (Deposition of Susan Bell), at 12-15.

Even so, it was the employees of the Dollar General who reported leaks to defendants JPP and Susan Bell.[128]  Further, the lease gave Dolgencorp the right to make repairs to the roof if defendant REC I failed to complete the repairs within thirty days, and allowed Dolgencorp to make any repairs when "property loss or injury to persons [was] threatened" — a right that Dolgencorp threatened to assert on four occasions.[129]  The lease also required Dolgencorp to have maintenance performed on its rooftop HVAC units at least four times a year.[130]

In support of its summary judgment motion, Dolgencorp cites *Raspilair v. Bruno's Food Stores, Inc.*, 514 So. 2d 1022 (Ala. 1987).[131]  In *Raspilair*, the plaintiff tripped and fell in the parking lot in front of the Bruno's and Wal-Mart stores located at a shopping center owned and operated by Hamilton Square Shopping Center, Inc. *Id.* at 1023.  The Supreme Court of Alabama affirmed the summary judgment in favor of Bruno's and Wal-Mart because plaintiff could not establish that they had a duty to maintain the parking lot:

---

[128] Doc. no. 45-5 (Deposition of Susan Bell), Exhibit 8 (Year-to-Date Ledger); doc. no. 45-6 (Deposition of James Hill), at 14-15; doc. no. 49-2 (Deposition of Bruce Akers), at 25; doc. no. 50-1 (Deposition of Teresa Sanders), at 56-57.

[129] Doc. no. 60-1 (Dolgencorp Lease), JPP 70, ¶ 7 (alteration supplied); doc. no. 60-2 (Dolgencorp Default Letters).

[130] Doc. no. 60-1 (Dolgencorp Lease), JPP 84, ¶ 37.

[131] Doc. no. 45-2 (Brief in Support of Motion for Summary Judgment by Dolgencorp, LLP), at 4.

> Both Wal-Mart and Bruno's had leases with Hamilton Square that
> contained provisions obligating Hamilton Square to clean and maintain
> the parking lot . . . . The record discloses no evidence that Wal-Mart or
> Bruno's was ever under a duty to maintain the parking lot, nor does it
> disclose any evidence that Wal-Mart or Bruno's ever undertook any
> maintenance functions in the parking lot.

*Id.* at 1024. *Raspilair* is distinguishable on several grounds. While the parking lot

of the shopping mall in *Raspilair* was not exclusively occupied by any one of the

adjacent business, the Dollar General was exclusively occupied by defendant

Dolgencorp. Further, in contrast to the tenants in *Raspilair*, Dolgencorp was "under

a duty" to maintain the Dollar General's rooftop HVAC units, "undertook" the

"functions" of reporting the leaks in the roof of the store, and reserved the right to

make emergency repairs when "property loss or injury to persons is threatened."[132]

"In Alabama the duty owed by an owner *or occupier* of premises to an invitee

or independent contractor injured by a dangerous instrumentality on those premises

is well settled[.]" *Wallace v. Tri-State Motor Transit Co.*, 741 F.2d 375 (11th Cir.

1984) (alteration and emphasis supplied); *see also Mitchell v. Moore*, 406 So. 2d 347,

349 (Ala. 1981) (noting a judgment against both the property owner *and the tenant*

*business* on a slip and fall claim). Accordingly, this court holds that Dolgencorp was

an invitor of Mr. Shaneyfelt.

---

[132] Doc. no. 60-1 (Dolgencorp Lease), JPP 70, ¶ 7 (alteration supplied); doc. no. 60-2 (Dolgencorp Default Letters).

**B.      Did the Roof Have a Hidden Defect, and Did Mr. Shaneyfelt Have Actual or Constructive Knowledge of the Defect?**

All four defendants claim that the defect in the Dollar General roof was not hidden, and that Mr. Shaneyfelt knew or should have known of the defect based on the rust on the deck.[133]  However, the parties have presented conflicting evidence on the visibility and significance of the rust before Mr. Shaneyfelt's fall.

Tip Top Roofing Contractor Sammie Earskine testified that, by some point in 2009, the rust on the Dollar General deck was visible from the floor of the store through the holes in the ceiling tiles, including the rust in the area through which Mr. Shaneyfelt later fell.[134]

However, in April of 2009, Centimark, a national roofing contractor, examined the roof and reported that, as of the date of the assessment, "the structural deck of the roof appears to be in good condition from the underside.  There were no visible deficiencies noted that caused concern."[135]

On August 30, 2011, Mr. Shaneyfelt attempted to "trouble shoot" the leaks in the Dollar General Roofs by drawing diagrams of three leaks on the main floor and

---

[133] Doc. no. 44 (Brief in Support of Motion for Summary Judgment by REC I/Blue Springs Limited Partnership, JP Properties, Inc., and Susan Bell), at 22-27; doc. no. 45-2 (Brief in Support of Motion for Summary Judgment by Dolgencorp, LLP), at 5-9.

[134] Doc. no. 56-2 (Deposition of Sammie Earskine), at 43-44, 47-48, 58-60, 62-64, 84.

[135] Doc. no. 57-1 (2009 Roof Replacement Proposals), at 21.

two in the back storeroom, one of which corresponded with the area of the storeroom through which he later fell.[136]  Mr. Shaneyfelt also took photographs from the floor of the store, some of which showed parts of the underside of the deck as seen through the gaps in the ceiling tiles, but none of which showed rusted decking.[137]  In his e-mail to defendant Susan Bell, Mr. Shaneyfelt proposed to replace the Dollar General roof, and did not mention the condition of the deck.[138]

After Mr. Shaneyfelt's death, plaintiff's expert, Barry Leach, testified that the rust on the Dollar General deck was visible from some points on the floor of the store.[139]  Nevertheless, one Dollar General employee testified that the rust on the deck was not visible from the floor of the storeroom,[140] and another employee testified that the deck itself was not visible from the floor in the area of the storeroom where Mr. Shaneyfelt fell.[141]

In any event, plaintiff's experts agreed that the presence of rust on the *surface*

---

[136] Doc. no. 43-8 (E-Mail Dated Aug. 30, 2011 from Dan Shaneyfelt to Susan Bell), at JPP 0037; doc. no. 43-15 (Dan Shaneyfelt Dollar General Diagram), at JPP 0033; doc. no. 43-16 (Deposition of Barry Leach), at 111-12; doc. no. 43-17 (Deposition of Matthew Sams), at 138-39.

[137] Doc. no. 43-8 (E-Mail Dated Aug. 30, 2011 from Dan Shaneyfelt to Susan Bell); doc. no. 43-18 (Photographs Attached to E-Mail Dated Aug. 30, 2011from Dan Shaneyfelt to Susan Bell), at Shaneyfelt 149-52; doc. no. 52-1 (Deposition of Ben Hixson), at 61.

[138] Doc. no. 43-8 (E-Mail Dated Aug. 30, 2011 from Dan Shaneyfelt to Susan Bell).

[139] Doc. no. 16 (Deposition of Barry Leach), at 55-57, 149-150.

[140] Doc. no. 49-2 (Bruce Akers), at 43-44.

[141] Doc. no. 50-1 (Deposition of Teresa Sanders), at 38.

of a deck does not necessarily indicate that the deck is structurally unsound.[142]

Accordingly, expert Matt Sams testified that the deck's "structural inadequacies . . .

were not obvious to Mr. Shaneyfelt on the day of the accident."[143]  Even so, expert

Barry Leach testified that Mr. Shaneyfelt had enough experience to recognize that

rust can weaken a metal deck over the long term.[144]

Consulting structural engineers from The Kachele Group then used scissor lifts

to access the underside of the area of the Dollar General roof where Mr. Shaneyfelt

fell.[145]  The engineers found "[f]ully deteriorated roof decking . . . in areas with intact

paint surfaces and surfaces evidencing only tiny pinholes or blemishes on the painted

surfaces.  These were identified by random pushing up from below."[146]  Accordingly,

Kachele concluded that:

> Based on the fact that even an area evidencing no paint damage
> from below has corroded to the point that hand pressure pushed through
> the metal decking, we do not consider the deck's visual appearance to
> be a sufficient indicator of the adequacy of the metal decking.  Because
> the corrosion of the roof decking initiates on the top surface of the
> decking that is hidden from observation, there is no way to know for
> certain the true condition of the roof decking (without first removing all

---

[142] Doc. no. 43-16 (Deposition of Barry Leach), at 150-51, 157; doc. no. 53-1 (Deposition of Matt Sams), at 43-45.

[143] Doc. no. 53-1 (Deposition of Matt Sams), at 51-55.

[144] Doc. no. 43-16 (Deposition of Barry Leach), at 207.

[145] Doc. no. 54-1 (Kachele Roof Decking Condition Investigation), at JPP 242.

[146] Id. at 244 (alteration supplied).

of the roofing materials).[147]

In sum, neither Mr. Shaneyfelt's diagrams and photographs of the leaks in the Dollar General roof, nor his e-mail to defendant Bell outlining his proposal for repairing the roof, establish that Mr. Shaneyfelt knew of the existence of rust on the deck.  The testimony of Tip Top Roofing Contractor Sammie Earskine conflicts with the testimony of two Dollar General employees regarding whether (and where) the rust was visible from the floor of the store.

Further, assuming that Mr. Shaneyfelt knew of the rust, the testimony of Barry Leach, one of plaintiff's experts, clashes with the evidence from: Centimark, a national roofing contractor; Matt Sams, plaintiff's other expert; and Cachelle, a group of consulting structural engineers, on the issue of whether the existence of rust was sufficient to place Mr. Shanyefelt on notice that the deck had weakened to the point that it could not support the weight of a person.

Even so, defendant Dolgencorp claims that the facts of this case are "strikingly similar" to those of *Ex parte Meadowcraft Industries, Inc.*, 817 So. 2d 702 (2001).[148] In *Meadowcraft*, the Supreme Court of Alabama reversed a judgment in favor of the employee of a subcontractor who injured his leg by climbing onto the conveyer belt

---

[147] *Id.* at 243-44 (alterations supplied).

[148] Doc. no. 45-2 (Brief in Support of Motion for Summary Judgment by Dolgencorp, LLP), at 6.

that he was hired to repair.  *Id.* at 710.  "[T]he evidence in [the *Meadowcraft* case] establishe[d] that [the premises owner], in fact, *warned the independent contractor of the dangers posed by the conveyor-belt system*."  *Id.* at 709-10 (alterations and emphasis supplied).  In the case before this court, none of the four defendants warned Mr. Shaneyfelt that the deck was rusted, that the deck was "bad," or that the roof was becoming dangerous.[149]

"[O]nce a plaintiff has made a *prima facie* showing that a defect in a part of the premises has caused an injury, then the question whether the defendant had actual or constructive notice of the defect will go to the jury[.]"  *Mims v. Jack's Restaurant*, 565 So. 2d 609, 610 (Ala. 1990) (alterations supplied).  Here, a reasonable factfinder could interpret the conflicting evidence to indicate that the Dollar General roof had a hidden defect, and that Mr. Shaneyfelt had neither actual nor constructive knowledge of the defect.  Accordingly, defendants cannot use those arguments to defeat the existence of a duty, or to prevail on affirmative defenses requiring the victim to appreciate the danger, including the existence of an "open and obvious" defect, contributory negligence, or risk assumption.[150]

---

[149] *See* doc. no. 56-2 (Deposition of Sammie Earskine), at 43-44, 47-48, 58-60, 62-64, 84 (describing what Tip Top Roofing Contractor Sammie Earskine told defendant Susan Bell and Dollar General Managers).

[150] An "open and obvious" defect is one that "*the injured party should be aware of in the exercise of reasonable care.*"  *Williams v. Bruno's Inc.*, 632 So. 2d 19, 22 (Ala. 1993) (emphasis supplied).  "To establish contributory negligence as a matter of law, a defendant seeking a summary

## C.    Did Defendants Know the Condition of the Dollar General Roof?

All four defendants claim that they did not know the condition of the Dollar General roof.[151]   However, it is undisputed that the roof "started leaking real bad" when the store first opened in 2004, and continued to have numerous leaks until Mr. Shaneyfelt's fall on October 12, 2011.[152]   Within the year of the Dollar General's opening in 2004, the roof had deteriorated to the extent that water was pouring through the deck onto the floor, which essentially required the installation of a new roof in a 50 square foot area of the store.[153]

According to Tip Top Roofing Contractor Heath Jones, the roof of the Dollar General leaked so often throughout the rainy season that he dealt with its property manager, defendant Susan Bell, on a daily basis.[154]   Mr. Jones also testified that

---

judgment must show that the plaintiff put himself in danger's way and that *the plaintiff had a conscious appreciation of the danger at the moment the incident occurred*." *Sessions v. Nonnenmann*, 842 So. 2d 649, 653 (Ala. 2002) (emphasis supplied). "[T]o establish assumption of risk, the defendant must prove that *the plaintiff understood the danger involved*." *Gean v. Cling Surface Co.*, 971 F.2d 642, 646 (11th Cir. 1992) (alteration and emphasis supplied) (citing *Slade v. City of Montgomery*, 577 So.2d 887, 892 (Ala.1991)).

[151] Doc. no. 44 (Brief in Support of Motion for Summary Judgment by REC I/Blue Springs Limited Partnership, JP Properties, Inc., and Susan Bell), at 17-20; doc. no. 45-2 (Brief in Support of Motion for Summary Judgment by Dolgencorp, LLP), at 12.

[152] Doc. no. 49-2 (Deposition of Bruce Akers), at 26; doc. no. 50-1 (Deposition of Teresa Sanders), at 33-36; doc. no. 55-1 (Deposition of Shawn Terry), at 30-3; doc. no. 56-1 (Deposition of Susan Bell), at 56-61; doc. no. 56-2 (Deposition of Sammie Earskine), at 12, 18-20; doc. no. 59-1 (DGM 2009-2011 Roof Work History).

[153] Doc. no. 56-1 (Deposition of Susan Bell), at 37; doc. no. 56-2 (Deposition of Sammie Earskine), at  26, 58-61; doc. no. 59-4 (2004 Roof and Deck Replacement).

[154] Doc. no. 54-2 (Deposition of Heath Jones), at 39.

45

during the two and one half years he worked for Tip Top Roofing, the company was called out to the Dollar General approximately fifty times.[155]   In 2008, Mr. Jones informed Ms. Bell at least once that the deck was rusted, and "three or four times" that the roof should be replaced.[156]

In March of 2009, Tip Top Roofing sent defendants JPP and Susan Bell an e-mail with a quote for replacing the Dollar General roof, making a point of excluding the cost of replacing the deck.[157]  Ms. Bell forwarded the quote to Andrea Plotkin, the owner and president of JPP, expressing dismay at the price of the repairs, and noting that the store had "2,000 to 3,000 [square feet] of rusted metal decking."[158]

The following month, defendant Susan Bell and Andrea Plotkin arranged for Centimark, a national roofing contractor, to inspect all the roofs at the Blue Springs Village Shopping Center.[159]   In its "Roof Assessment and Proposed Solution," a twenty-page report accompanied by diagrams and photographs, Centimark concluded, in part, that:

> The roof [of the Dollar General] is in poor condition.  A new roof installation is now recommended.  This roofing work is suggested now to eliminate the risk of expensive tear off and potential deck replacement

[155] *Id.* at 106-09.

[156] *Id.* at 112-18.

[157] Doc. no. 57-1 (2009 Roof Replacement Proposals), at 2.

[158] *Id.* (alteration supplied).

[159] *Id.* at 6.

associated with continued repairs or re-roofing delays.[160]

By some point in 2009, the rust on the deck was visible from the floor of the store through the holes in the ceiling tiles, which allowed Tip Top Roofing Contractor Sammie Earskine to show the rust to defendant Susan Bell and the managers of the Dollar General, including the rust in the area through which Mr. Shaneyfelt later fell.[161]  Mr. Earskine told Ms. Bell that the deck was "bad," and he told the managers that the roof was becoming dangerous because the leaks trapped water on top of the deck, and the more water stayed on the deck, the worse it would get.[162]

On the basis of that evidence, a reasonable jury could conclude that all four of the defendants were aware of the deterioration of the deck of the Dollar General roof. *See Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*).  Thus, plaintiff has presented sufficient evidence to survive all four defendants' motions for summary judgment on the issue of their knowledge of the defect.   *See id*. Accordingly, plaintiff has established the existence of defendants' duty to Mr. Shaneyfelt.

### D.	Did Defendant Dolgencorp's Actions Constitute Wantonness?

---

[160] *Id.* at 21 (emphasis in original) (alterations supplied).

[161] Doc. no. 56-2 (Deposition of Sammie Earskine), at 43-44, 47-48, 58-60, 62-64, 84.

[162] *Id.*

Defendant Dolgencorp denies that its actions rose the level of wantonness.[163]

> "Wantonness" has been defined by [the Supreme] Court [of
> Alabama] as the conscious doing of some act or the omission of some
> duty while knowing of the existing conditions and being conscious that,
> from doing or omitting to do an act, injury will likely or probably result.
> *Bozeman v. Central Bank of the South*, 646 So. 2d 601 (Ala. 1994).  To
> constitute wantonness, it is not necessary that the actor know that a
> person is within the zone made dangerous by his conduct; it is enough
> that he knows that a strong possibility exists that others may rightfully
> come within that zone.  *Joseph v. Staggs*, 519 So. 2d 952, 954 (Ala.
> 1988).  Also, it is not essential that the actor should have entertained a
> specific design or intent to injure the plaintiff, only that the actor is
> "conscious" that injury will likely or probably result from his actions.
> *Id.*  "Conscious" has been defined as "'perceiving, apprehending, or
> noticing with a degree of controlled thought or observation:  capable
> of or marked by thought, will, design, or perception'"; "'having an
> awareness of one's own existence, sensations, and thoughts, and of
> one's environment; capable of complex response to environment;
> deliberate.'"  *Berry v. Fife*, 590 So. 2d 884, 885 (Ala. 1991) (quoting
> *Webster's New Collegiate Dictionary* 239 (1981) and *The American
> Heritage Dictionary of the English Language* 283 (1969), respectively).

*Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (alterations supplied).  If a factfinder

decides that defendant Dolgencorp knew of the deterioration of the deck of the Dollar

General roof, the factfinder could determine that Dolgencorp likewise knew that

permitting Mr. Shaneyfelt to access the roof without warning him about the condition

of the deck would "likely or probably result" in injury.  In *Mitchell v. Moore*, 406 So.

2d 347 (Ala. 1981), for example, the Supreme Court of Alabama affirmed a finding

---

[163] Doc. no. 45-2 (Brief in Support of Motion for Summary Judgment by Dolgencorp, LLP), at 12.

that a shopping mall owner acted wantonly by receiving knowledge of a dangerous defect and failing to investigate or remedy the defect. *Id.* at 352-53. Thus, plaintiff has presented sufficient evidence to withstand Dolgencorp's motion for summary judgment on the wantonness issue.

## VI.  CONCLUSION

For the reasons explained above, the motions to exclude the expert testimony and to strike the affirmative defense are GRANTED, and the motions for summary judgment are DENIED.

DONE this 7th day of March, 2013.

United States District Judge

49